## Case No. 7,289.

### The JEREMIAH.

[10 Ben. 326.] [1]

District Court, S. D. New York. March, 1879.

D. McMahon, for libellants.
W. R. Beebe, for claimants.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

CHOATE, District Judge. This is a libel by the owners of the schooner P. A. Sanders against the brig Jeremiah to recover damages for the loss of the schooner by a collision with the brig. The collision took place about six miles off the Jersey coast, a little to the north of Barnegat, about three o'clock in the morning of the 16th of March, 1876. The schooner was bound on a voyage from Virginia to New York with a load of wood. The brig was bound on a voyage from New York to Cardenas and was light.

The case, as stated in the libel, is that the night was clear and starlight, the wind blowing about a five-knot breeze from or about E. N. E.; that the schooner was close-hauled, sailing by the wind about N. by E.; that the brig had the wind free and all sail set; that when the brig was first seen she was to the leeward of the schooner, bearing directly down on her, but so as to have cleared the schooner by keeping off a little; that instead of doing so she came directly down on the schooner, striking her on the port side between the foremast and the forerigging; that the collision was caused by the negligence of those in charge of the brig, by not keeping a good lookout and in not keeping off, and in a general recklessness in her navigation. The answer of the brig is that the night was clear, the wind about E. N. E., a four-knot breeze, the brig on a course S. by W.; that the lookout reported a vessel on the starboard bow; that they saw her sails, but no light, and she was then about three-quarters of a mile away; that she bore about half a point on the starboard bow of the brig, and immediately the mate, whose watch it was, gave an order to luff, which was done, and she came up about three points, thus bringing the schooner three to three and a half points on the starboard bow of the brig; that owing to this change of course it became necessary to haul in the braces, and the lookout was called to assist in doing so, and that this had scarcely been completed when it was discovered that the schooner had changed her course and was standing directly across the bows of the brig and was only a few feet distant from her, and instantly thereafter the collision took place; that the collision was caused by the fault of the schooner in not keeping her course, in not keeping a good lookout, and in changing her course and standing across the bows of the brig, and in not having proper lights, and in not having them properly burning.

Captain Leek, the master of the schooner, was at the wheel, and he testifies that he was sailing by the wind close-hauled, heading about N. by E.; that he had two men forward, one of whom, Wright, was acting as lookout; that the lookout reported "a vessel to leeward;" that almost at the same moment he saw the vessel approaching, about a point to leeward; that he could see her sails, but not her lights; that she was perhaps three hundred yards off; that he kept on his course, merely trying to keep her as close as possible to the wind; that she will not sail nearer than five points to the wind; that instead of keeping off the brig luffed and ran into him; that both his lights were set and burning brightly; that he took them down and blew them out after the collision. The two other men on the deck of the schooner were colored men from the Eastern Shore of Maryland; one of them, Wright, was called as a witness by the libellants. The other was not called, and it was shown that all reasonable efforts to find him had failed. Wright, who was evidently a very unintelligent person, testified that he was acting as lookout; that he was forward on the deck load; that they were, at the time of the collision, sailing close-hauled, N. by E., the wind being E. N. E.; that the first he saw of the brig was about a hundred yards ahead of them a little on the lee bow; that he sung out to the captain "a schooner on our lee bow," and that then he started and ran aft; that when he first saw the brig she was bound down the coast and he could see both her lights. He says that the brig struck the schooner on her lee bow. When asked which bow was his lee bow, he answered the starboard bow; he testified that he saw the captain take down and blow out the schooner's lights after the collision. He said that the deck load was nine feet high, and that from where the captain stood at the wheel he could not see anything forward on account of the deck load; that as soon as he reported the light he went aft, and before he got aft the vessels were together. He further said that the wind struck on the port side of the schooner. It is evident that unless the schooner changed her course just before the collision, this witness has confounded port and starboard, for it admits of no question that the wind had, until just before the collision, been on the starboard side of the schooner, and her port side was her lee side. And all the witnesses agree that she was struck on her port side.

On the brig it was the mate's watch. The mate and two men were on deck, and they were all called as witnesses by the claimants. Anderson, the man at the wheel, testified that he was steering S. by W. by compass; that they were sailing about four miles an hour, the wind being E. N. E., and they had all sail set; that the lookout sung out "a vessel on the starboard bow;" that the mate was standing about three feet from him and went forward, and after going forward ordered him to luff; that he obeyed the order and luffed up three points and steadied on that course; that after he luffed, the mate and lookout went to brace the foreyards; that he did not see the schooner till they were together; that after he luffed he did not change his course till the collision. Brown, the lookout, testified that when he first saw the schooner she was a mile or a mile and a half off, bearing a point to a

point and a half on the starboard bow; that he sung out to the mate "a vessel on the starboard bow;" that the mate came forward and looked and told the man at the wheel to luff; that the brig did luff; that he was then called away by the mate to help haul in the braces, and the next he saw of the schooner she was across their bows at the very instant they came together; that when he first saw the schooner he saw her sails and both bows, but no lights; that they seemed to be coming nearly head and head to each other then; that he didn't look at the schooner from the time he left the forecastle deck to help haul in the braces till she lay across his bows. Brown, the mate, testified that the brig was heading S. by W. right down the coast; that the lookout reported a vessel on the starboard bow; that he went forward and saw the vessel a little on the starboard bow, about half a point, about a mile off; that he saw no light, but saw her sails; that he ordered the wheelsman to luff; that he luffed three points and a half, good; that he looked at the vessel till his vessel came to; that the schooner was on a N. by E. course, the regular course up the beach as near as he could judge; that it became necessary to haul in on the braces, and he called off the lookout to help him do it; that then the vessels were three-quarters of a mile apart; that after hauling in the braces he looked to leeward and there saw the schooner twenty feet off crossing their bow from their starboard to their port; that she was heading straight across their bow. The captain of the brig, who was below, came up on the noise of the collision, and testified that his vessel was then heading S. S. W. by the compass; and that the schooner was heading E. N. E. as near as he could judge.

It is perfectly evident that if the story of those on the brig is true and the schooner kept on her course, no collision could have taken place; that the brig, being on the windward or starboard hand of the schooner and then luffing three points, the two vessels would have got further and further out of each other's way every instant and would have passed each other at a considerable distance, if they were, as those on the brig say, not less than three-quarters of a mile apart when the brig luffed. But it is the theory of the claimants that after the brig luffed the schooner ported, came up in the wind and went off on the other tack and thus intercepted the course of the brig and stood across her bows. And it is the claim of the brig, in explanation of the fact, that those in charge of the brig kept no lookout for the schooner after luffing, that this manoeuvre of the brig was made at such a safe distance that the brig had a right to pass on either side, and that after luffing the vessels were not in a position relatively to each other such as to involve danger of collision, and that there-

fore, and because it was the duty of the schooner to keep on her course, the brig was not chargeable with any further duty of observing her movements. It is clear that this is the only theory that can explain the collision, if the schooner changed her course at all, and if the story of those on the brig is correct, for if the schooner made any other change it is demonstrably impossible for the two vessels to have come together; clearly so if she had starboarded and kept off more to the northward, and equally clearly if she had ported and come up in the wind but had not filled away on the other tack, for she would have lost her headway and never could have overtaken the brig.

But the difficulty with this theory of the collision is that it has no support, either in probability or proof. It is not pretended by those on the brig that they saw any such manoeuvre on the part of the schooner. They all admit that they did not look at her or see her after luffing till the vessels were actually in collision, and when they luffed she was standing north by east. If the witnesses from the brig are entirely truthful it was a genuine surprise to them when they saw the schooner's bow right under the bows of the brig, and upon the observations they had made of her position and course and their own, and their calculations as to the effect of their luffing, and of her expected keeping on her course, she should have already passed under their stern and been far to leeward. So far as they are concerned, therefore, this theory is a mere conjecture, based upon the supposition that they had made no mistake of observation or judgment. Such theories proposed by parties so obviously careless as these men were, are entitled to little favor unless backed up by strong proof or probability drawn from the entire evidence. In the brief observation they took of the schooner they did not see or did not observe her lights—they thought she was three-quarters of a mile away. Without seeing her lights their judgment as to her course and movements was necessarily very liable to error, yet basing their own manoeuvre on such observation and judgment of distance and course, they luffed, and then, trusting that they had done enough, failed wholly to keep any lookout for this or any other vessel, calling the lookout away for other ship's duty. This was gross carelessness which suggests of itself a prior inaccurate and careless observation of the schooner's position and movements. The theory is also utterly inconsistent with the positive testimony of those on the schooner as to her movements. Capt. Leek, who was at the wheel, swears positively that he kept her by the wind, heading N. by E.; that he saw the brig near at hand on the lee bow when she was reported; that the brig luffed and ran into him. The facts testified to by Capt.

Leek are such that he must have told a deliberate falsehood if the schooner in fact went up in the wind and stood off on the other tack, changing to the eastward and southward ten points, as she must in that case have done. So far as his testimony is concerned it is not a mere question of accuracy of observation or of memory, but of truthfulness. It is also impossible to reconcile this theory with the testimony of Wright the lookout. It is true that Wright says that the starboard side was the lee side and the booms of the schooner swung to starboard, and on this statement the claimants' counsel greatly relies in the support of his theory of the case that the schooner was standing on the other tack, which would have made her starboard side her lee side and would have accounted for her boom's swinging to starboard. But an attentive reading of this witness's deposition shows a hopeless confusion of mind as to the use of the words "lee" and "starboard," and upon that deposition alone it might be concluded with great probability that he had by mistake used these words erroneously. Thus, he says the brig struck the schooner's lee bow. It is admitted her port bow was struck. Therefore he cannot really have understood or intended to say that the starboard side was the lee side at the time of the collision. All the evidence in the case was taken by deposition, which does not afford the same opportunities for correcting mistakes in testimony, as in case of testimony given before the court when the parties and witnesses are all present. But independently of this it is clear that Wright's testimony as a whole does not support the claimant's case. As he recollected the circumstances of the collision the whole thing was almost instantaneous. The schooner was standing on her course close-hauled by the wind, heading N. by E. when he saw and reported the brig to leeward. He ran aft and before he got there the collision occurred. He may be mistaken in the length of time and the distance of the two vessels apart when he first saw the brig. He is so unless all the other witnesses who testify to distance are mistaken. But he does not say the schooner came up in the wind or went off on the other tack, and such a movement is inconsistent with what he tells us that he did observe. Moreover, the exigency of the claimant's case requires that if the schooner made this movement at all she should have made it instantly after the brig luffed. Except upon that supposition she never would have overtaken the brig, especially considering the time she would lose in putting about and getting filled away and the advantage the brig had in being already to the windward and getting steady on her new course before the schooner changed. The change of the brig three points further to the south and east and of the schooner ten points to the east

and south, in all a change in their relative courses of thirteen points, would, if they were before on nearly opposite courses, as seems to be conceded, bring them on converging courses, making an angle of only three points with each other, and as they were three-quarters of a mile apart when the change was made, on claimants' theory they would, if they came together at all, each have to run at least a mile before meeting each other. This is fatally irreconcilable with the whole tenor of Wright's account of the matter as well as Capt. Leek's. This theory of the claimants is also irreconcilable with all the probabilities of the case. The schooner had no sufficient motive to stand off on the other tack. She was well clear of the land and on her proper course, and the position of the brig and the well-understood duty of the brig to keep off as the schooner saw her position, would have made it an unnecessary and foolish movement on the schooner's part. It is not supported but rather refuted by the testimony of those on the brig as to the way the vessels came together. But further detail is needless. One circumstance which claimants rely on is that the brig's starboard bow port was knocked in. Whether this was done at the instant of collision or afterwards is not directly testified to. The claimants' counsel insists that on libellants' theory the brig's port bow was more directly exposed to injury from the angle at which, on the theory of the libellants, they must have come together. This is undoubtedly so, but the circumstances of the case afforded ample opportunity for the starboard bow port of the brig to be knocked in. The vessels were locked together half an hour, the stem of the brig having crushed in the side of the schooner. The sea meanwhile was rough and rising. As the captain of the brig says, they were "chawing" and "pounding" together all this time. It is not probable that they stood perfectly still. No injury shown to either bow of the brig was an unlikely result of this "chawing and pounding" process.

The theory of the claimants being then dismissed as wholly improbable and unproved, there is no rational explanation of the collision, except that positively testified to by the master of the schooner. It involves no intentional false statement by any witness. It only involves such carelessness of observation and error of judgment on the part of those in charge of the brig as we very frequently find, and must impute to one party or the other in collision cases, and which, are, indeed, themselves the ordinary causes of collisions. The mate and lookout, even if their memory is entirely accurate, may have easily, through carelessness of observation or mere error of judgment, thought the schooner was a little on their starboard bow, when, in fact, she was a little on their port bow. A man

at the wheel, as the captain of the schooner was, may, of course, misrecollect or misstate what he saw; but he cannot be mistaken at the time as to whether an object seen forward is on his port or starboard bow. His observation is aided and held to exact accuracy, by the range of the vessel's masts and bow immediately before him. He knows with certainty at the time whether he has to look to the right or the left to see the object. The element of error in observation is therefore eliminated from his testimony as to such a fact. It is otherwise with witnesses who stand on the bow of the vessel and see an object almost directly ahead. Their judgment as to whether it is a half point or a point on the one side or the other, may easily be mistaken, unless it appears that they take special pains to take the range of the vessel's course. These two witnesses vary between themselves by one point as to the bearing of the schooner. The liability of witnesses to misjudge distances in the night time, at sea, is too well known to excite remark. Everything which the master of the schooner says he saw the brig do, those on the brig admit that they did. The only difference is as to the time when it was done. The alleged contradiction of the master of the schooner by the look-out, Wright, as to the height of the deck load, and as to whether the master could see over it, is entitled to very little weight. The master testifies that there was a raised stand by the wheel for the purpose of enabling the man at the wheel to see forward; that his booms were raised so as not to be in the way; that he did see. With all the proofs of recklessness in navigation which collision cases afford, it is a little too improbable that the officer of the watch, who is responsible for the navigation of the vessel, should undertake to steer her with no means, in case anything is reported forward, of ascertaining what he must do without leaving his wheel. On this point I think the weight of evidence is that Wright is mistaken.

The true and only theory of this collision, then, is that the schooner made the brig on her lee bow; that she stood on her course close-hauled by the wind; that the brig, instead of keeping off, as she was bound to do, luffed up across the schooner's bows; that those in charge of the brig were careless and negligent, first, in their observation of the position of the schooner; and, secondly, in not keeping off and in luffing; and, thirdly, in not keeping a good lookout after luffing; that they mistook the distance of the schooner when they luffed, and that their carelessness was the sole cause of the collision. The proof of the alleged negligence on the part of the schooner in not having proper lights, in changing her course and crossing the bows of the brig and in not keeping a good lookout, has

wholly failed. As the brig has been sold, and her proceeds in the registry are admitted to be insufficient to satisfy libellants' damages, there seems to be no necessity for a reference. Decree for libellants, with costs.